1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9          FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11  AARON RIGO RODRIGUEZ,                    Case No.   1:21-cv-01266-KES-HBK (HC)

12              Petitioner,                  FINDINGS AND RECOMMENDATIONS TO
                                             DENY PETITION FOR WRIT OF HABEAS
13       v.                                  CORPUS AND DECLINE TO ISSUE
                                             CERTIFICATE OF APPEALABILITY [1]
14  GAMBOA,
                                             FOURTEEN-DAY OBJECTION PERIOD
15              Respondent.

16

17

18  **I.      STATUS**

19          Petitioner Aaron Rigo Rodriguez ("Petitioner" or "Rodriguez"), a state prisoner, is

20  proceeding pro se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on

21  August 20, 2021.  (Doc. No. 1, "Petition").  Petitioner challenges his convictions after a jury trial

22  for first degree murder, with additional findings that the crime was committed intentionally while

23  lying in wait, with premeditation and deliberation, with a firearm, and for the benefit of a criminal

24  street gang; active participation in a criminal street gang; conspiring to commit murder, with

25  additional findings that such was for the benefit of a criminal street gang and included the use of a

26

27  ─────────────
[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
28  (E.D. Cal. 2022).

                                    1

1   firearm; and preventing or dissuading a witness, with a gang benefit finding.[2]  (Case No.

2   BF159394C).  (Doc. No. 11-49 at 12-13, 15; Doc. No. 11-11 at 127-47).[3]  The Kern County

3   Superior Court sentenced Petitioner to life without parole plus an indeterminate term of 25 years

4   to life plus a determinate term of 14 years.  (Doc. 11-49 at 47; Doc. 11-12 at 175-79).

5          On appeal, the Fifth Appellate District Court concluded certain sentencing enhancements

6   should be stricken based on a change in the law.  (Case No. F074250).  (Doc. 11-49 at 50).  Thus,

7   the appellate court remanded the case for resentencing and instructed the trial court to also

8   consider whether any firearm enhancements should be stricken.  (*Id.* at 51).  The appellate court

9   otherwise affirmed the judgment.  (*Id.*).  On June 10, 2020, the California Supreme Court

10  summarily denied Rodriguez's petition for review.  (Case No. S261476).  (Doc. No. 11-52).  On

11  remand, the trial court re-imposed the original sentence.  (Doc. No. 11-53 at 6).

12         The Petition presents the following (restated) grounds for relief:

13             (1) The trial court improperly allowed the admission of evidence
14                 related to Petitioner's prior convictions.

15             (2) The admission of a co-defendant's statement violated
                   Petitioner's confrontation rights.

16             (3) Testimony from the gang expert also violated Petitioner's
17                 confrontation rights.

18             (4) Statement from a witness regarding Petitioner's arrest "on a gun
                   charge" violated his due process rights.

19             (5) The prosecution distorted the reasonable doubt standard in
20                 closing arguments, violating Petitioner's due process rights.

21             (6) The cumulative errors require reversal of Petitioner's
                   conviction.

22  (*See* Doc. No. 1 at 5-13).  Respondent filed an Answer (Doc. No. 12), arguing Petitioner was not

23  entitled to relief on any of his grounds, and lodged the state court record in support (Doc. Nos. 11,

24  11-1 through 11-53).  Petitioner did not file a traverse and the time to do so has expired.  This

25

26  [2] Additionally, the jury found Petitioner not guilty of threatening with intent to terrorize.  (Doc. No. 11-49
       at 15; Doc. No. 11-11 at 146).

27  [3] All citations to the pleadings and record are to the page number as it appears on the Case Management
28     and Electronic Case Filing ("CM/ECF") system.

1    matter is deemed submitted on the record before the Court.  After careful review of the record and

2    applicable law, the undersigned recommends the district court deny Petitioner relief on his

3    Petition and decline to issue a certificate of appealability.

4     **II.  GOVERNING LEGAL PRINCIPLES**

5      **A.  Evidentiary Hearing**

6       In deciding whether to grant an evidentiary hearing, a federal court must consider whether

7    such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

8    would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474

9    (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise

10   precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*.  Here,

11   the state courts adjudicated Petitioner's claims for relief on the merits.  This Court finds that the

12   pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary

13   hearing is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

14     **B.  ADEPA General Principles**

15      A federal court's statutory authority to issue habeas corpus relief for persons in state

16   custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

17   Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

18   first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

19   the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

20   of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

21   the merits, then AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*,

22   136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a

23   claim adjudicated on the merits, but only if the adjudication:

24        (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established Federal law, as
25        determined by the Supreme Court of the United States; or

26        (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
27        State court proceeding.

28

1   28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

2   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

3          "Clearly established federal law" consists of the governing legal principles in the

4   decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

5   U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

6   unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

7   to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

8   governing law set forth by Supreme Court case law; or (2) reached a different result from the

9   Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

10  12, 16 (2003).

11         A state court decision involves an "unreasonable application" of the Supreme Court's

12  precedents if the state court correctly identifies the governing legal principle, but applies it to the

13  facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

14  133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

15  [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

16  extend that principle to a new context where it should apply."  *Williams v. Taylor*, 529 U.S. 362,

17  407, (2000).  "A state court's determination that a claim lacks merit precludes federal habeas

18  relief so long as fair-minded jurists could disagree on the correctness of the state court's

19  decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the

20  state court decision "was so lacking in justification that there was an error well understood and

21  comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.

22         When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

23  State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

24  the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Burt*

25  *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

26  merely because the federal habeas court would have reached a different conclusion in the first

27  instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

28

4

1    Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

2    constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

3    *Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of

4    AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-

5    prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas

6    petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable

7    precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

8    112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails

9    to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has

10   cleared both tests." *Id.* at 134.

11   As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

12   an "adjudication on the merits" in state court. An adjudication on the merits does not require that

13   there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

14   at 98. "When a federal claim has been presented to a state court and the state court has denied

15   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

16   of any indication or state-law procedural principles to the contrary." *Id.* at 99. "The presumption

17   may be overcome when there is reason to think some other explanation for the state court's

18   decision is more likely." *Id.* at 99-100. This presumption applies whether the state court fails to

19   discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

20   289, 293, 298-301 (2013).

21   While such a decision is an "adjudication on the merits," the federal habeas court must

22   still determine the state court's reasons for its decision in order to apply the deferential standard.

23   When the relevant state-court decision on the merits is not accompanied by its reasons,

24   > the federal court should "look through" the unexplained decision to
25   > the last related state-court decision that does provide a relevant
     > rationale. It should then presume that the unexplained decision
26   > adopted the same reasoning. But the State may rebut the
     > presumption by showing that the unexplained affirmance relied or
27   > most likely did rely on different grounds than the lower state court's
     > decision, such as alternative grounds for affirmance that were
28   > briefed or argued to the state supreme court or obvious in the record
     > it reviewed.

1    *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state

2    court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

3    decision, as AEDPA directs us to do."  *Id.* at 1196.

4    **III.    RELEVANT FACTUAL BACKGROUND**

5           The Court adopts the pertinent facts of the underlying offenses, as summarized by the

6    California Fifth District Court of Appeal.  A presumption of correctness applies to these facts.

7    *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

8                               **FACTUAL AND PROCEDURAL BACKGROUND**

9    On October 16, 2014, shortly after 10:30 p.m., Delano police
10   officers found the dead body of Johnny Holguin near 13th
     Avenue and Clinton Street.  The 48-year-old victim had
11   sustained multiple gunshot wounds.  An autopsy confirmed the
     decedent's recent use of methamphetamine.

12   The victim was a former Norteño gang member.  According to
13   several witnesses, he dropped out of the gang a few months prior
     to his death.  From speaking with his family members, police
14   learned the victim was at a "dope house" on Belmont Street (the
     Belmont house) immediately prior to the shooting.  His body was
15   discovered approximately one block away from that address.

16   The primary occupant of the Belmont house was a woman
     named Julie.  However, one of the victim's daughters informed
17   police that a person named "Suspect" also lived there.  The daughter
     had spoken to Julie by phone several times on the night of
18   the incident.  In one of those conversations, after the victim had
     been shot, Julie claimed to be at the Delano Gardens apartment
19   complex with her friends Victor and "Solo" or "Suspect."  When
     police searched for "Suspect" in their "record system for
20   monikers," they learned it "was a moniker used by [defendant]
     Aaron Rodriguez," who was also known as "Solo."

21   On October 21, 2014, police conducted the first of several interviews
     with Julie.  She confirmed the victim had stopped by the Belmont
22   house on the night of the shooting.  Julie and her friend, Victor,
     were with him just minutes before he died.  She and Victor left the
23   house to run an errand and the victim departed on foot in the
     opposite direction.  Soon afterwards, they heard gunfire.

24   Julie claimed to have last seen the victim walking toward the
25   corner of Belmont Street and 12th Avenue.  As the interview
     progressed, she described being the last person to exit the
26   Belmont house and hearing Victor say that " 'a car came for
     Johnny.' "  Julie "didn't see the car," but Victor had allegedly
27   described it as an "Explorer [or] Expedition."

28

                                                6

When asked about Rodriguez, Julie said he visited the Belmont house on a regular basis but lived with his girlfriend in Porterville. She denied Rodriguez was present on the night of the shooting. According to her initial story, Rodriguez had stopped by the house at around 3:00 p.m. to retrieve his tattooing equipment before leaving town with his girlfriend.

In the early morning hours of October 23, 2014, police arrested defendants Medrano and Rodriguez, as well as Rodriguez's girlfriend, Janette, during a traffic stop outside of the Delano Gardens apartments. The incident reportedly involved "gun and gang charges" unrelated to the Holguin murder, but the basis for taking Rodriguez's girlfriend into custody is not entirely clear from the record. Unlike most of the people involved in this case, Janette had no criminal history and, notwithstanding her relationship with Rodriguez, she did not associate with gang members.

Police questioned Janette regarding the subject matter of the arrest. At the conclusion of the interview, as she was being taken to jail, Janette volunteered to provide information about a separate incident. She then tearfully recounted the following events.

Janette awoke on the morning of October 17, 2014, to discover she had missed several phone calls from Rodriguez. He had been trying to reach her since midnight. When she called him back, Rodriguez asked to be picked up from a house on 13th Avenue in Delano " 'as soon as possible.' " Janette obliged and drove from Porterville to the specified location. Upon meeting up with Rodriguez, she moved into the passenger seat and let him drive her car.

Rodriguez told Janette, "[S]ome guy got shot last night ... and ... I need to destroy this phone." He removed the SIM card from his mobile phone, broke it apart, and threw the pieces out the car window. Rodriguez said he had spent the night with a friend because " 'that guy that got shot was last seen leaving the house,' " i.e., the Belmont house. Next, Rodriguez lowered his voice and whispered a confession about his role in the killing.

Referring to the victim as "the dog," Rodriguez told Janette "they" had wanted the dog dead because "he snitched on somebody." Rodriguez had been ordered to facilitate the murder, and he claimed responsibility for planning it out. An opportunity presented itself when the victim showed up at the Belmont house and began "crying to Julie about his granddaughter." Rodriguez, who was there when the victim arrived, called "the homie" to report "that the dog was ready to be picked up." However, Rodriguez soon learned the victim had made arrangements to get a ride from his daughter, so Rodriguez "called his homie" and said, "[T]he dog pound is gonna pick him up[,] it's not gonna happen." When the daughter failed to appear, Rodriguez called the person back and said, "[T]he dog is still here[,] he's still here."

7

After making his last phone call, Rodriguez urged Julie to leave the house with him, saying, " 'Julie let's go get the water. Let's go.' " Janette was admittedly confused by this part of the story, but she repeated what Rodriguez had told her: "When he was walking to get the water, he said he heard gunshots. He said he heard six, seven gunshots. And he ran to see ... who it was. And he said he seen the guy on the [ground]. And Aaron's, like, 'I can't believe he did it right here on the corner.'"

Subsequent to making his confession, Rodriguez met up with defendant Medrano. With Janette still present in the vehicle, Medrano and Rodriguez openly discussed the murder. Janette heard Medrano say, " 'I just got off the car and I—I shot that fool in the head.' " Medrano claimed to have fired "six [or] seven" rounds. These details were significant because the victim was in fact shot six times, including twice in the head, but police had not publicly disclosed that information.

Medrano's statements indicated that a female had driven him to the Belmont house. He told Rodriguez, " 'That bitch [was] going to leave me and I told her to wait.' " Medrano had apparently lured the victim toward the woman's car by saying, " '[Y]our daughter sent me to pick you up.' "

After learning of Rodriguez's involvement in the murder, Janette attempted to break up with him. His reaction frightened her. She told the police he had said, " 'What you're gonna go snitch on me? You're gonna go snitch on me? Watch. Something's gonna fucking happen to you if you do, bitch.' "

Unaware of Janette's disclosures, Rodriguez agreed to be interviewed by police. He was confident and talkative during the first hour of questioning, delivering monologues on topics ranging from his history with the Norteños to the ups and downs of his relationship with Janette. He equivocated on his status as an active gang member, saying he was active but no longer participated in criminal activity: "I associate. Put it that way. I associate. ... I'm allowed to come around, put it that way." The detective asked if that meant he was "in good standing" with the Norteños, and he replied, "Exactly. Exactly."

Rodriguez explained how he essentially became homeless after breaking up with Janette earlier that year; they had only recently begun to "patch things up." He claimed to be living "in the streets" but admitted to occasionally staying at the Belmont house with Julie, who was a longtime friend. When asked about the murder, Rodriguez said he was in Porterville with Janette the entire night. The alibi matched Julie's initial statements to police about Rodriguez stopping by the house to pick up his belongings and then leaving with his girlfriend.

Rodriguez's demeanor changed when the police suggested they might question Janette about his alibi. He became agitated and defensive, saying, "I know how this goes detective. I mean the thing is my girlfriend doesn't, you know what I mean? And I'm not saying

she knows something, [what] I'm saying is she can easily be twisted and turned up to where she don't know—and I don't wanna be looking like a damn liar."

While one detective continued to interrogate Rodriguez, a second detective left the room, ostensibly to "go ask the girl" if Rodriguez was lying about the alibi. A few minutes later, the detective returned and said, "The girlfriend says he was not there." Rodriguez stuck to his alibi for a little while longer before offering to tell "the truth." He then stated, "When I got out of prison last year, I dropped out. Okay. I dropped out. Swear to God, I dropped out." The detectives seemed underwhelmed, and Rodriguez said they were "missing the point." Although his supposed dropout status was still a secret, the Norteños allegedly viewed him as a "question mark," meaning someone whose commitment to the gang was in doubt. Therefore, according to Rodriguez, he "wasn't close enough" to any active members to be entrusted with information about a gang murder.

By the end of the interview, Rodriguez had revised his alibi: "[Julie] called me to help her out with the water. ... Uh, when I showed up, she was on the verge of leaving. Um, me and her friend were walking. We were gonna go to [Julie's boyfriend's] house .... Uh, he had a dolly to carry the jugs in.... [¶] ... [¶] [W]hen I walked up, [the victim] ... walked that way, to the—to, uh, like that house across the street. And he walked straight.... [¶] ... [¶] Because there was a car waiting for him. And then all of a sudden, we took off. And I go, 'Who was that?' She says, 'Oh, that's just Johnny.' "

Rodriguez claimed he, Julie, and her friend (Victor O.) had already walked "around the corner" when they heard gunshots. They abandoned their plan to get the dolly and "went straight to [Julie's] mom's house," i.e., Delano Gardens, approximately eight blocks south of the Belmont house. Once there, they "hung out" until Rodriguez started receiving text messages from "Jay" informing him of rumors about his involvement in the shooting. Jay was Rodriguez's former coworker and the boyfriend of one of the victim's daughters. Upon learning of the accusations, Rodriguez left Delano Gardens and walked to a friend's house on 13th Avenue, where he spent the night.

Defendant Medrano also submitted to police questioning. He denied any involvement in the shooting and claimed to have been in Bakersfield for most of the day, i.e., October 16, 2014. Police had arrested him that morning on an out-of-state warrant and transported him to the Kern County jail. He was released in the afternoon but had to wait several hours for a ride home. His girlfriend, Diana T., picked him up sometime "around 9:00 at night" and drove him to Delano, stopping along the way for food. Medrano estimated they arrived at Diana's apartment in Delano Gardens at approximately 10:00 p.m. At that point, his alibi became less coherent.

Medrano said he "chilled" at Diana's apartment until approximately 3:00 a.m. and then traveled to Bakersfield with

someone named "Veronica" (he was unable to provide a last name or contact information). His time with Veronica was cut short when a cell phone mishap resulted in him being "caught" by Diana. Medrano told the detectives, "[S]he found out I was with another girl and I had to come back and explain myself to her." Veronica drove Medrano back to Delano Gardens, and he got to Diana's apartment at around "1:00 or 2:00 in the morning."

On the same day as defendants' arrest, after questioning Janette, Rodriguez, and Medrano, police conducted a followup interview with Julie and also spoke to Victor O. Julie again claimed Victor was the only person with her at the time of the shooting. However, while retelling her initial story, Julie abandoned the narrative and admitted she was lying. More specifically, she alleged Rodriguez had accompanied her and Victor on their walk to Delano Gardens.

When asked why she had lied, Julie said she felt scared and intimidated. She cried several times during the interview, often while expressing her fear of Rodriguez. According to her changed story, Rodriguez stopped by the Belmont house in the afternoon to retrieve a personal item and then left with his girlfriend, but he returned after dark. There was a rear entrance through which Rodriguez came and went, and he had stayed in the "back room" while Julie and Victor socialized with Johnny Holguin in the front living room. Rodriguez had known the victim was there, and Julie suspected he was somehow involved in the murder.

Julie's second interview corroborated some of Janette's information regarding Rodriguez's alleged confession. Julie said Rodriguez had been "anxious" to leave the house right before the shooting: "[H]e was rushing me out[,] like rushing me[,] like hurry up let's go—let's go—let's go—let's go—let's go get the water[,] like rushing me to get water." Meanwhile, a vehicle pulled up outside and, according to what Victor had told her, an unidentified male approached the residence. Victor allegedly recognized this person as someone who had visited Rodriguez on prior occasions. Julie claimed there were only two people who visited Rodriguez at the Belmont House: "Michael [Medrano] and Chris [Hernandez]."

Julie exited the house in time to see Medrano entering the rear passenger door of a Jeep Cherokee or similar-looking sport utility vehicle (SUV). Despite only seeing him from behind, Julie was certain of the man's identity. She emphasized, "I am not wrong," and also said, "I swear, I swear, I swear, I know that it was Michael." Julie saw the victim go "right up to the car," but he eventually "walked away and didn't get in the car." The victim proceeded east on 12th Avenue toward Clinton Street, and the vehicle drove north on Belmont Street toward 13th Avenue. At the conclusion of her interview, Julie identified Medrano from a photographic lineup.

Victor's account, as told to police on October 23, 2014, differed from Julie's story. He admitted using methamphetamine with Julie

10

and the victim on the night of the shooting, but he denied the part about Rodriguez being inside the house. The victim had complained about getting into an argument with his "wife" and mentioned that it had something to do with his granddaughter. The victim eventually called his daughter for a ride, but the person who showed up was a man who allegedly identified himself as "Daniel." Victor claimed this person had spoken to him from the driver's seat of what "looked like an Expedition," saying, " 'I'm here to pick up the old man.' "

Victor and Julie heard gunfire as they were walking north on Austin Street on their way to borrow a dolly. They immediately turned around and went to Julie's mother's apartment in Delano Gardens. According to Victor, Rodriguez met up with them a few blocks south of the Belmont house and said, " 'You guys take forever.' " When asked to explain Rodriguez's sudden appearance, Victor said, "[H]e was somewhere over there, I guess, he was somewhere over there and we were going that way and he was just gonna meet up with us and just keep on going ... to [Julie's] mom's." The detective wanted to know, "Where did he come from?" and Victor replied, "He was at his friend's I guess."

On October 24, 2014, police interviewed the victim's daughter, Brianna, and her then boyfriend, "Jay." Brianna claimed to have heard rumors that her father was killed by "two guys and a chick." The male perpetrators were allegedly identified as " 'Frankie' and 'Suspect.' " The rumored involvement of "Frankie" was also mentioned during Jay's interview.

Jay lived with Brianna, the victim, and the victim's girlfriend. He was acquainted with Rodriguez from a previous job. Rodriguez was a tattoo artist, and Jay had recently spoken to him about getting a tattoo. Approximately one or two days prior to the shooting, Rodriguez visited Jay at home to discuss the tattoo. During their conversation, Rodriguez pulled out a handgun and asked Jay for help procuring ammunition. Jay apparently led Rodriguez to believe he could assist him, and Rodriguez later sent him text messages asking for bullets of a certain caliber, saying he " 'needed them ASAP.' " Although Jay had access to bullets, he never gave any to Rodriguez and became wary of him after learning of the victim's death.

After being interrogated at the police department, Medrano and Rodriguez were transported to the Kern County jail. The following evening, October 24, 2014, Medrano made a telephone call to his girlfriend, Diana, which was recorded. Diana told him police officers had searched her apartment earlier in the day, and Medrano said, "[S]omebody's talking about some shit they shouldn't be talkin' about." Later in the conversation, Medrano complained about a person named "Pancho" and Pancho's failure to post bail for Janette, referring to her as "the homie's girl." Medrano said that if the roles were reversed, he would employ any means necessary to "get the bitch outta here." Diana told him she had chastised Pancho during a recent conversation, telling Pancho,

" 'Like Michael said ... you asked him to do something and he did it? ... Well fuck, you can't even show the same love back?' "

According to the People's gang expert, "Pancho" is the nickname of a "higher ranking Norteño" named Francisco Martinez. Diana testified that Pancho is also known as "Frankie." Another person frequently mentioned in Medrano's conversations with Diana was "Cyclone," who multiple witnesses identified as a Norteño gang member named Christopher Hernandez, also known as "Baby Cyclone."

On October 25, 2014, Diana visited Medrano in jail. Their conversation was recorded. Medrano again complained about Pancho's failure to post bail for Janette, expressing concern Janette might have already "started to sing." He also spoke ill of Rodriguez, saying, "I feel like he's just gonna— he's gonna sell me [out] or something .... [¶] ... [¶] ... I think he's gonna—he's gonna snitch ...." "[T]his fool ain't no gang banger really. ... [T]he only reason why I talk to him [is] because P[a]ncho. [¶] ... [¶] ... That's why I feel like P[a]ncho led me into the blind and ... put me somewhere I shouldn't have been."

With further regard to Janette, Medrano told Diana: "[Rodriguez] doesn't want—Pancho to come bail her out because he knows P[a]ncho's gonna come and tell her straight up like bitch, you better woo—woo—woo, just keep your fucking mouth shut. ... This fool wants her just to get out and that's it. ... It don't work like that though. [¶] ... [¶] ... I told him I was like, 'Fool your girl even wants to keep on like slipping and talking fool, I'll have her touched too.' " Medrano claimed to have issued a warning to Janette when they were taken into custody: "I had told her ... 'Loose lips sink ships, you know what I mean?' "

On December 29, 2014, Rodriguez had a "debriefing interview" with a jail classification officer. The interview was conducted at Rodriguez's request as part of his official defection from the Norteño gang. He discussed his history with the gang, confirmed his moniker was "Suspect," and revealed information about the gang's hierarchy, politics, and leadership personnel. Rodriguez also volunteered information about the Holguin murder, claiming to have heard the victim was killed for betraying the Norteños.

Rodriguez claimed to have been told the victim and his son-in-law—both active Norteños at the time—were arrested on drug charges. The victim allegedly "threw the blame off on [his son-in-law]" and then dropped out of the gang. Making matters worse, the victim told police "who they get the dope from in Delano," which further angered the gang. Rodriguez cited two sources for this information: a former cellmate and his local "squad leader."

On January 6, 2015, Rodriguez and his legal counsel met with homicide detectives and a deputy district attorney. Rodriguez requested the meeting, apparently with the hope of avoiding charges in this case. The record contains a summary of the

interview, but the trial court granted a defense motion to exclude any evidence of his statements.

Rodriguez reportedly accused Medrano of killing the victim and denied any complicity in the murder. He also claimed to have spoken with Francisco Martinez, i.e., Pancho/Frankie, at Delano Gardens on the night of the shooting. Pancho allegedly told him Medrano had been instructed to stab the victim four times, which was supposed to be his punishment for snitching on four people. Rodriguez informed Pancho that Medrano had "gone above and beyond on his own."

Rodriguez said Medrano was driven to the Belmont house in a Ford Explorer and came inside to speak with him prior to the shooting. Following their arrest, Medrano allegedly identified the driver as a woman named "Ann" and mentioned a second passenger named "Chris." Medrano had told Ann and Chris "that they were going to buy dope," and Ann later " 'freaked out' to the point [where] she was going to leave him and he had to tell her not to leave."

On January 14, 2015, Medrano's girlfriend, Diana, was questioned at the Delano police department. Due to an alleged equipment malfunction, the interview was not recorded. Police arranged for another meeting, telling Diana that because she had been "crying a lot," they hadn't understood all of her statements. The second interview was conducted and recorded on January 20, 2015.

Diana acknowledged picking up Medrano from jail on the night of the shooting and driving him to Delano. She said "somebody was calling him" on their way home, and Medrano "took off" after they arrived at her apartment complex, i.e., Delano Gardens. Diana's description of these events is difficult to follow on the recorded interview, but she mentioned seeing Rodriguez "out there in the front" and claimed both of them eventually returned to her apartment.

Diana more clearly described a prior conversation with someone named "Ann" or "Annmarie" (the names were used interchangeably). One day after the shooting, Annmarie confided in her that she had driven Rodriguez and Medrano to the Belmont house. Diana quoted her as saying, " 'We were supposed to go to Aaron's house and I don't know what the heck happened ..., they just got out of the car and then, ... [t]hey just shot him.' " In a subsequent conversation, Medrano admitted to Diana that he "was there" with "Aaron and Ann."

During the same interview, Diana said Rodriguez and Medrano both carried guns. She explained, "[T]hey're gang guns. They—they belong to the gang. [¶] ... [¶] ... So once you use them[,] the gang gets rid of them." Diana had seen Rodriguez in possession of multiple firearms and claimed to have witnessed a group of men deliver a gun to him at the Belmont house a few days prior to the shooting. At trial, she testified one of those men was Pancho.

On January 21, 2015, the police, acting on information provided by Diana, located Annmarie Ojeda at a motel in Earlimart. She was questioned that afternoon and again the following day. Ojeda confessed to being an unwitting participant in the crime. According to her story, an acquaintance named "Josh" had called her to request a ride for two of his friends. Ojeda was already driving to Delano, so she agreed to "do him a favor." Josh said his friends would be waiting at a bus stop outside of Delano Gardens.

Ojeda followed Josh's instructions and picked up two Hispanic males in her 1998 Ford Explorer. The front passenger door was broken, so both men sat in the back seats. Ojeda recognized them—allegedly from once having seen them together in Earlimart—but they were basically strangers. The man who sat behind the driver's seat did all the talking. When detectives inquired about his identity, Ojeda said, "I think his name was Michael."

Michael asked Ojeda to drive them to the Belmont house, indicating it would be an interim stop on the way to another destination. She drove there and parked across the street, at which point Michael exited, walked to the residence, and went inside. He was gone for over 30 minutes, which caused Ojeda to become impatient. Two other men came out of the house before Michael finally emerged and walked back to the vehicle. He reentered the Explorer and gave Ojeda driving instructions, directing her north, around a corner, and then south before saying, " 'Turn around ..., let me talk to somebody that's right there.' " Michael lowered his window and said something to a pedestrian "to make him come closer." He then exited the vehicle and shot the man, firing approximately "five or six rounds."

Michael got back into the Explorer and yelled, " 'Go—go' "; the other passenger remained "very calm" and "very quiet." Ojeda was initially "shocked and speechless" but began screaming as she drove away. A few blocks later, she stopped near a convenience store and ordered the men to get out, which they did. She then drove back to Earlimart. The next day, Ojeda took the Explorer to a car wash and allegedly found bullets in the back seat. Police were unable to verify her discovery of bullets and a search of the vehicle yielded no inculpatory evidence.

At the conclusion of Ojeda's second interview, she was shown two sets of photographs, each containing six images. The first set included a picture of Medrano. After examining the photos for approximately 45 seconds, Ojeda pointed to Medrano and said, "Yeah, he looks familiar." She circled his picture, identifying him as the shooter and the person she had been calling "Michael."

Ojeda spent approximately 23 seconds looking at the lineup containing Rodriguez's picture before saying, "I'm not sure." A few seconds later she said, "Yeah, I think—he looks a little bit familiar," and then circled the image of Rodriguez. Earlier in the interview, Ojeda had recalled the nonshooter having tattoos on his head: "[Y]ou could see the tattoos through his fade [haircut]....

14

So I remember he had tattoos on his sides right here and some on the back." Although not visible in the photo lineup, Rodriguez did have a large tattoo across the back of his head. However, there was no evidence of him having tattoos on the sides of his head.

On March 5, 2015, the Kern County District Attorney (DA) filed a criminal complaint accusing Medrano, Ojeda, and Rodriguez of crimes related to the shooting of Johnny Holguin. Four days later, the authorities conducted additional interviews with Julie and Rodriguez. Citing information provided by "people in the vehicle," which in reality meant Ojeda's selection of Rodriguez's photo from a lineup, the lead detective pressed Julie to admit Rodriguez was not with her at the time of the shooting. Julie was steadfast in her refusal, at one point telling the detective, "By me saying he wasn't there I would be lying to you."

In Rodriguez's interview, the same detective tried to get him to admit he was Ojeda's second passenger. Rodriguez denied the allegation and said, "[I will] be straight up with you. It was that guy, Chris Hernandez. They call him Baby Cyclone, okay. He was in that car." Rodriguez accurately noted that Hernandez "has a tattoo on his head like me." However, his story changed yet again, and in the third version Rodriguez placed himself inside the Belmont house for several hours leading up to the shooting, "in the backroom sitting there watching TV." He had previously said Julie called him for help with the water claimed to have arrived at the house just as the victim was leaving.

Rodriguez said Pancho had told him the story behind the murder. The DA's investigator asked if Pancho "[called] the hit on Holguin," and Rodriguez replied, "I don't think he called it but someone else called it. [¶] ... [¶] Uh, Evil." "Evil" was the street name of a person reputed to be one of the highest ranking Norteños in Delano.

Rodriguez repeated what he had said in previous interviews: the victim betrayed his son-in-law after both of them were arrested on drug charges and also told police the identity of their "dope" supplier. Allegedly, the supplier was "Evil." This story was consistent with information Diana had provided two months earlier. She claimed to have heard the victim was killed because "he fucked over Evil." Furthermore, Medrano had made references to "Evil" during his recorded jail calls. At trial, Diana testified Medrano had told her Evil ordered the victim's murder because the victim was dealing drugs without paying "taxes" to the gang. Medrano was told "to follow orders, and he had to go do that if he wanted to get on [Evil's] good side."

On March 22, 2015, Rodriguez made a recorded jail call to Janette. She was aloof and asked why his attorney had recently tried contacting her. Rodriguez said he was troubled by "all the statements people are making against me. [¶] ... [¶] Even you." Janette replied, "Like what? 'Cuz I said the truth?" That led to the following exchange:

"[RODRIGUEZ]: [The attorney] said that I, I had something to do with that. Like I, I set it up, I, I don't know, I don't know where that came from, but whatever.

"[JANETTE]: Really?

"[RODRIGUEZ]: I didn't say that ....

"[JANETTE]: Ok, I don't want to talk about it then. Ok.

"[RODRIGUEZ]: Ok, well I'm just letting you know that right there is what's going to get it done.

"[JANETTE]: Alright, just forget about me then."

Rodriguez continued to deny ever saying "anything like that," but Janette's responses did not support his denials. She became emotional, and Rodriguez said, "Don't cry. ... I already know they made you say that for their, their, 'cuz you were in jail and you were scared, ok. I know this. I know that's not you. But the thing is, I, I was high that day, ok. I was on drugs." Rodriguez may have been referring to his alleged confession, but Janette apparently thought he was talking about the murder. She said, "Is that my fault, Aaron? Is that my fucking fault what you fucking did?" Rodriguez expressed confusion, and Janette told him, "Aaron, don't act stupid. You know the life you wanted at that time, don't act stupid."

…

The trial evidence clarified the timeline of events. On October 15, 2014, the day before the shooting, Medrano borrowed Diana's car to drive Rodriguez to Porterville to meet up with Janette. This was Janette's first time meeting Medrano. They went back to Delano in separate cars. Janette drove Rodriguez in her vehicle, but both cars stopped in Earlimart while Medrano made contact with someone at a hotel. Later that evening, at Diana's apartment in Delano Gardens, Janette tried methamphetamine for the first time. She and Rodriguez stayed the night and were in Diana's apartment the next day when Medrano was arrested.

On the day of the shooting, at approximately 12:00 p.m., probation officers came to Delano Gardens in search of a third party. They spotted Christopher Hernandez (Cyclone/Baby Cyclone) coming out of Diana's apartment and contacted him about a different matter. While dealing with Hernandez, the officers saw Medrano and soon discovered he had an outstanding warrant from Wisconsin. Medrano was arrested and transported to the Kern County jail in Bakersfield. However, "the office in Wisconsin had closed for the day," and, due to a lack of "paperwork," "the jail refused to take him." Medrano was released at approximately 3:40 p.m.

Meanwhile, in Delano, Janette dropped off Rodriguez at the Belmont house and drove home to Porterville. She needed to get

back in time for a late afternoon work meeting. Diana testified to picking up Medrano from jail "between 7:00 and 9:00 p.m." She estimated the drive from Bakersfield to Delano took 35 minutes. It was unclear whether her estimate included their stop at a gas station to get food, but she did say they ate "on the road." When they arrived at Delano Gardens, Diana went up to her apartment and Medrano "stayed in the parking lot." Based on low-resolution surveillance footage from nearby buildings, the shooting occurred at approximately 10:18 p.m. Therefore, Medrano had sufficient time to commit the murder.

All of the witnesses who were questioned by police gave inconsistent testimony at trial. Consequently, the jury saw and/or heard most of the recorded interviews. For example, Jay testified about Rodriguez asking him for bullets but denied seeing Rodriguez with a firearm, claiming to have only seen a tattoo gun. Jay was impeached with his interview statements, which described the item as a chrome-colored semiautomatic handgun of a particular caliber, decorated with red tape or a red bandana. The last detail was noteworthy because Diana had told the police Medrano and his fellow gang members spray painted and/or decorated their guns for identification purposes. She described Medrano's gun as having "a red bandana around it."

Julie was arrested for refusing to appear at trial. On the witness stand, she stated, "I don't want to testify." Nevertheless, she testified to seeing Medrano get into the passenger seat of an SUV behind the driver just before the victim was killed. She maintained Rodriguez was with her at the time of the shooting. However, Victor testified Rodriguez did not meet up with them until after the shooting, alleging they had crossed paths with him approximately two blocks south of the Belmont house on their way to Delano Gardens.

Janette claimed to have difficulty remembering what she had said during her recorded interview. Her memory problems were especially acute with regard to details tending to incriminate Rodriguez. However, she did testify to hearing Rodriguez tell Medrano, " 'I told you, fool, to wait outside, but you came inside the house ....' " Janette had better recall of Medrano's statements, and she testified to hearing him say he "got off the car, went up to that guy, and shot him ... [¶] ... [¶] [in] the head." Janette also "heard him say that the girl that was driving him was going to leave him when he shot that guy[,] and he yelled out, 'You better wait. If, not, I am going to shoot you too.' "

The People's case included testimony by a gang expert and other law enforcement officials. This evidence confirmed, inter alia, the victim had been incarcerated at a pretrial facility a few months prior to his death and had a cellmate whom Rodriguez identified as a source of information about the murder. The victim went into protective custody after telling jail officials he had "snitched" and was being threatened by the inmates in his "pod." …

…

17

1

2

3

4

5

6

7

8

> Rodriguez's defense case focused on the identity of Ojeda's second passenger, arguing the nonshooter accomplice was actually Christopher Hernandez. The defense evidence included photographs of Hernandez and of the tattoos on the side and back of his head. Ojeda stood firm on her identification of Rodriguez, but defense counsel argued it was because she was afraid of jeopardizing her plea bargain. Counsel also highlighted numerous discrepancies in Ojeda's testimony. The defense further argued Rodriguez was a gang dropout at the time of the incident and thus had no motive to harm the victim. In response to the Christopher Hernandez theory, the People argued Rodriguez was guilty of murder as an accomplice and coconspirator regardless of whether he was a passenger in Ojeda's vehicle.

9

(Doc. 11-49 at 2-15 (footnotes omitted)).

10

## IV.    ANALYSIS

11

Each of Petitioner's grounds were raised on direct appeal to the Fifth Appellate District

12

Court and denied on the merits, then subsequently raised and summarily denied by the California

13

Supreme Court.  Thus, each ground is exhausted, and the Court looks through to the Fifth

14

Appellate District's reasoned decision in evaluating each of Petitioner's claims under the

15

deferential standard of review.  *Wilson*, 138 S. Ct. at 1192.

16

### A.    Ground One-Admission of Prior Convictions

17

In his first ground, Petitioner argues the trial court abused its discretion and violated his

18

due process rights when it allowed the introduction of evidence relating to his prior convictions

19

for burglary and illegal possession of a firearm.  (Doc. No. 1 at 5).

20

#### 1.  State Court Decision

21

The Fifth Appellate District denied Plaintiff's claim, ruling as follows:

22

23

24

25

26

27

28

> Section 186.22 prohibits active participation in a criminal street gang, as set forth in subdivision (a), and includes sentencing enhancement provisions, which are found in subdivision (b). The elements of the offense are: "First, active participation ..., in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) The enhancements apply when a felony is committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd.

(b).) Additionally, pursuant to section 190.2, subdivision (a)(22), the crime of murder is punishable by death or LWOP if the perpetrator "was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

"A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' statutorily enumerated criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' " (*People v. Zermeno* (1999) 21 Cal.4th 927, 930.) The list of qualifying offenses is found in section 186.22, subdivision (e)(1)–(33). In this case, the People introduced evidence of eight predicate offenses committed by six different people, including Medrano and Rodriguez. This was done to prove the existence of the Norteño criminal street gang and other elements of the gang charges.

The predicate offenses evidence was ruled admissible but limited in scope to "the fact of conviction, the nature of the conviction, the [name of the party convicted], and as to each predicate, the association of the defendant with the relevant gang, [i.e.,] ... the Norteños or the northern gang." Consequently, the jury learned Rodriguez was convicted of second degree vehicle burglary in 2004 and of unlawful firearm possession in 2011. The jury learned Medrano suffered juvenile adjudications in 2006 for vehicle theft and grand theft, and a juvenile adjudication in 2008 for attempted burglary.

Rodriguez contends the probative value of his earlier convictions was marginal and substantially outweighed by the danger of undue prejudice. Although his claim is based on Evidence Code section 352, he argues the error violated his constitutional right to due process and a fair trial. Medrano joins in these arguments to the extent they apply to the evidence of his juvenile adjudications.

In *People v. Tran* (2011) 51 Cal.4th 1040, the California Supreme Court authorized the use of a defendant's prior convictions to prove the predicate offenses requirement of section 186.22. (*Tran*, at p. 1046.) A trial court may admit such evidence regardless of the prosecution's ability to rely on offenses committed by other gang members. (*Id.* at pp. 1048–1049.) A defendant's criminal history can be "highly probative" of several elements the People must establish, including the gang's primary activities, a predicate offense, and the defendant's knowledge of a pattern of criminal activity by the gang's members. (*Id.* at pp. 1048, 1050.) Although section 186.22 requires proof of only two predicate offenses, trial courts have broad discretion to determine the number of separate incidents upon which the People may rely. (See, e.g., *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436 [no abuse of discretion in allowing proof of six predicate offenses]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1137–1139 [same; eight predicate offenses].)

In the interest of judicial economy, we will dispose of defendants' claims for lack of prejudice without addressing the question of

1     error. "The admission of relevant evidence will not offend due

2     process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) As our analysis will make clear, defendants'

3     fundamental unfairness argument has no merit. If an abuse of discretion occurred, it is subject to review under the *Watson*

4     standard.

5     Rodriguez complains of the jury learning he was "a former felon who was convicted of burglary and firearm-possession offenses in

6     2004 and 2011." The prejudice, he contends, flows from negative inferences likely drawn by jurors regarding his criminal

7     propensities. Rodriguez is forgetting he provided a detailed summary of his criminal "career" during the March 9, 2015,

8     interview with Detective Scott and the DA investigator. A recording of the interview was admitted as People's exhibit No. 112

9     and played for the jury.

10    During the interview, Rodriguez said his earliest conviction occurred in 2004: "I was arrested for receiv[ing] stolen property. [¶]

11    ... [¶] ... It was a vehicle right there on, by the cemetery. [¶] ... [¶] [It] had the keys in it. ... I got convicted." Next, he discussed being

12    on felony probation in 2005 and getting "caught with receiving stolen property" a second time: "I had like, [a] bag full of, like,

13    Santa Claus. It had, like, some stereos and amps, and the cops pulled me over on a bike and they chased me, whatever." Rodriguez

14    chronicled his "stint[s]" in various correctional facilities and explained how he became involved with the Norteños and

15    developed a drug habit. While telling these stories, he admitted committing other crimes, e.g., "I went to Earlimart. Same thing

16    happened there. I tried to take a car and I got caught."

17    Rodriguez described himself as "a petty criminal that has a drug problem." In an earlier interview, he had mentioned getting out of

18    prison "last year," i.e., in 2013. These various admissions severely undermine his prejudice argument. Furthermore, Janette testified to

19    his commission of domestic violence during their relationship, which presumably impacted the jury's view of his character. The

20    2011 predicate offense for gun possession, which predated the Holguin murder by three years, was not discussed in the interview.

21    However, as we explained in relation to Diana's testimony about the "gun charge," there was extensive admissible evidence showing

22    Rodriguez's possession of firearms within days of the shooting. For these reasons, plus the overall strength of the People's case in

23    comparison to the defense case, it is not reasonably probable Rodriguez would have achieved a better outcome had the trial court

24    excluded the predicate offenses evidence.

25    (Doc. No. 11-49 at 33-35).

26              **2. Analysis**

27        Petitioner argues his prior convictions were inadmissible for any legitimate purpose and,

28    because "[t]his was a close case," the error in admitting the evidence was not harmless beyond a

1    reasonable doubt.  (Doc. No. 1 at 5).  For additional arguments, Petitioner cites to his separately

2    filed Exhibit A, which is a copy of his petition for review in the California Supreme Court.  (*See*

3    Doc. No. 1 at 5; Doc. No. 9).  However, while these additional arguments expand on Petitioner's

4    assertion that it was a close case and challenge the evidence against him (*see* Doc. No. 9 at 15-

5    22), Petitioner wholly fails to engage with the appellate decision's conclusion—specifically, that

6    the evidence of his prior offenses as predicate offenses to support the gang charges and

7    enhancements was not prejudicial because evidence regarding his criminal history had already

8    been admitted through Petitioner's own statements in the recorded interview.  Petitioner has

9    failed to present any argument as to why the state court's decision was contrary to, or an

10   unreasonable application of, Supreme Court precedent or based on an unreasonable determination

11   of the facts.

12          Generally, federal habeas relief is not warranted based only on alleged errors in state law,

13   including errors in interpreting and applying the state evidentiary rules.  *Estelle v. McGuire*, 502

14   U.S. 62, 67-68, 72 (1991); *see Walden v. Shinn*, 990 F.3d 1183, 1205 (9th Cir. 2021) ("we cannot

15   grant federal habeas relief founded on an alleged non-constitutional state evidentiary error").

16   However, when "evidence is introduced that is so unduly prejudicial that it renders the trial

17   fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a

18   mechanism for relief."  *Andrew v. White*, 145 S.Ct. 75, 78 (2025) (quoting *Payne v. Tennessee*,

19   501 U.S. 808, 825 (1991)).  To obtain relief on an evidentiary ruling, the petitioner must show

20   that the error was of a constitutional dimension and that it was not harmless.  *Brecht v.*

21   *Abrahamson*, 507 U.S. 619, 623 (1993).  In other words, habeas relief is not warranted unless the

22   specific error had a "substantial and injurious effect or influence in determining the jury's

23   verdict."  *Id.*

24          Here, the state appellate court rejected Petitioner's claims after concluding he was not

25   prejudiced by the evidence of his prior convictions in light of other evidence admitted at trial.

26   Given the deferential standard mandated by § 2254(d), the undersigned cannot find this harmless

27   error determination unreasonable.  As the appellate court indicated, the recording of Petitioner's

28   interview with police included multiple statements regarding previous convictions and his time in

1  prison. (Doc. No. 11-6 at 117-25).  Thus, even if the trial court improperly allowed the evidence

2  relating to the prior convictions in relation to the predicate offenses, Petitioner has failed to show

3  such had a "substantial and injurious effect or influence in determining the jury's verdict" given

4  the jury heard Petitioner's own statements regarding his prior convictions.  *Brecht*, 507 U.S. at

5  623.

6         Ultimately, Petitioner fails to demonstrate that the state court's rejection of his prior

7  conviction claim was contrary to, or an unreasonable application of, clearly established federal

8  law, or based upon an unreasonable determination of the facts.  Thus, the undersigned

9  recommends that ground one be denied.

10        **B.      Ground Two-Codefendant's Statement**

11        Petitioner's second argument challenges the admission of his codefendant's statement

12  implicating Petitioner in the shooting death.  (Doc. No. 1 at 7).

13              **1.  State Court Decision**

14        In rejecting Petitioner's claim, the Fifth Appellate District court found as follows:

15              Rodriguez moved in limine to exclude the following excerpt from
                Diana's recorded police interview:
16
                "DETECTIVE SCOTT: ... Has [Medrano] talked to you about
17              Holguin's murder? ...

18              "[DIANA]: Kind of.

19              "DETECTIVE SCOTT: What did he kind of say?

20              "[DIANA]: That he knows he's probably gonna get caught up for
                that.
21
                "DETECTIVE SCOTT: Did he say why he might get caught up for
22              that?

23              "[DIANA]: Because he was there.

24              "DETECTIVE SCOTT: He told you that? Did he tell you who was
                with him?
25
                "[DIANA]: Aaron and Ann."
26
                The People argued the evidence was admissible in its "complete
27              context" under the hearsay exception for statements against a
                declarant's penal interest. Rodriguez's trial counsel disagreed and
28              argued for exclusion "under *Aranda-Bruton*." The trial court ruled

in favor of the People, finding (1) the statements attributed to Medrano were against his penal interests and (2) the surrounding circumstances provided adequate indicia of reliability. On appeal, Rodriguez maintains the reference to "Aaron and Ann" was inadmissible under state and federal law.

Hearsay, meaning an out-of-court statement used to prove the truth of the matter asserted, is generally inadmissible. (Evid. Code, § 1200; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.)

"Evidence Code section 1230 provides in relevant part: 'Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, ... so far subjected him to the risk of ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true.' " (*People v. Dalton* (2019) 7 Cal.5th 166, 207.)

The proponent of such evidence must show " ' "that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." ' " (*Ibid.*) "We review a trial court's decision as to whether a statement is against a defendant penal interest for abuse of discretion." (*People v. Lawley* (2002) 27 Cal.4th 102, 153.)

The relevant facts are analogous to those in *People v. Cortez* (2016) 63 Cal.4th 101. There, the defendant Norma Cortez was jointly tried with a male codefendant on charges arising from a drive-by shooting. The trial court admitted a recording of a police interview with the codefendant's nephew, who was a nonparty witness. During his interview, the nephew repeated incriminating statements the codefendant had made during a private conversation. The codefendant told his nephew he committed the crime with a woman " 'in her car,' and that she 'was the one driving' and 'he was the one shooting.' " (*Id.* at pp. 107–108.) "At first, [the nephew] said he could not remember the woman's name. Asked whether her name was 'Stephanie,' 'Sylvia,' 'Nancy,' 'Mickey,' 'Martha,' or 'Norma,' he said, 'Norma. I think it's Norma.' He then confirmed [the codefendant] had 'said her name.' " (*Id.* at p. 108.)

The trial court in *Cortez* admitted the interview under Evidence Code section 1230 over an objection that the codefendant's statements regarding Cortez's participation in the crime were inadmissible. The California Supreme Court upheld the ruling. The codefendant's statements were "unquestionably nontestimonial," which meant the defendant had no grounds to allege a violation of her Sixth Amendment confrontation rights. (*People v. Cortez, supra*, 63 Cal.4th at p. 129.) Thus, pursuant to *Cortez*, a codefendant's nontestimonial incriminating statements do not implicate *Aranda/Bruton* principles. (*Cortez*, at p. 129; *People v. Gallardo* (2017) 18 Cal.App.5th 51, 68–69.)

For Sixth Amendment purposes, "[t]estimonial statements are those

made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony." (*Sanchez, supra*, 63 Cal.4th at p. 689.) They are typically made in formal proceedings "or in response to structured police questioning." (*People v. Smith* (2005) 135 Cal.App.4th 914, 924.) Rodriguez concedes Medrano's statements to Diana were not testimonial. Furthermore, he acknowledges we are bound by the holding of *Cortez* (see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) and explains his Sixth Amendment claim is being raised "to preserve the issue for federal review." We accept the concession and, in light of *Cortez*, reject his Sixth Amendment claim on the merits. (See *People v. Cortez, supra*, 63 Cal.4th at p. 129, citing *Davis v. Washington* (2006) 547 U.S. 813, 824 and quoting *People v. Geier* (2007) 41 Cal.4th 555, 603 ["the confrontation clause applies *only to testimonial hearsay statements* and not to [hearsay] statements that are nontestimonial"].)

(Doc. No. 11-49 at 22-24).

## 2. Analysis

In support of ground two, Petitioner argues he was denied his right to confront Medrano and "[i]t is reasonably probable that Medrano's damning statement was what caused the jury to find [Petitioner] guilty as there was no physical evidence linking him to the crime and each of the prosecution's main witnesses had serious questions surrounding their credibility." (Doc. No. 1 at 7). Petitioner argues that "even though Medrano's out-of-court statement that he was with 'Aaron and Ann' was non-testimonial" under *Crawford v. Washington*, 541 U.S. 36 (2004), it nonetheless directly inculpated Petitioner such that it was inadmissible against him under *Burton v. United States*, 391 U.S. 123 (1968).

The Sixth Amendment grants a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "*Bruton* established that in joint criminal trials, the introduction of 'powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant,' but who does not testify, violates the defendant's Sixth Amendment right to confront the witnesses against him." *Lucero v. Holland*, 902 F.3d 979, 983 (9th Cir. 2018) (quoting *Bruton*, 391 U.S. at 135-36). Subsequently, "*Crawford* added a new layer to Sixth Amendment analysis—that the Amendment's Confrontation Clause right attaches only as to 'testimonial statements.'" *Id.* at 984 (citing *Crawford*, 541 U.S. at 68).

1    Contrary to Petitioner's arguments, the Ninth Circuit has concluded that when the

2    challenged statements are "nontestimonial and so not within the Confrontation Clause's

3    protection under *Crawford*, the *Bruton* protections concerning the introduction of statements

4    by non-testifying codefendants do not apply." *Id.* This is because "*Crawford* concluded …

5    that the Confrontation Clause was concerned only with certain kinds of out-of-court

6    statements—those derived from interrogations and other forms of 'the civil-law mode of

7    criminal procedure'" while "*Bruton*'s narrower focus was on whether statements that would

8    otherwise violate the Confrontation Clause may be introduced in a joint trial" and "[i]ts

9    holding—essentially, that such statements may not be introduced if the defendant is

10   identifiable—does not define, or redefine, the basic scope of the Confrontation Clause's

11   protections." *Id.* at 987. Thus, "*Bruton*'s limitation on the introduction of codefendant's out-

12   of-court statements is necessarily subject to *Crawford*'s holding that the Confrontation

13   Clause is concerned only with testimonial out-of-court statements." *Id.*

14   Petitioner conceded that the challenged statement was nontestimonial such that under

15   *Crawford*, no Confrontation Clause right attached. Thus, Petitioner cannot show that the

16   state court's rejection of this claim was contrary to, or an unreasonable application of, clearly

17   established federal law, or based upon an unreasonable determination of the facts. The

18   undersigned recommends that ground two be denied.

19   **C.    Ground Three-Gang Expert**

20   In ground three, Petitioner argues gang expert Brian Monteiros's recitation of

21   inadmissible case specific hearsay as the basis of his opinion violated his right to confront the

22   witnesses against him. (Doc. No. 1 at 8).

23   **1.  State Court Decision**

24   In addressing confrontation claims concerning the gang expert raised by Petitioner and his

25   codefendant, the Fifth Appellate District first set out the applicable law:

26   "Expert testimony is admissible to establish the existence,
     composition, culture, habits, and activities of street gangs; a

27   defendant's membership in a gang; ... the 'motivation for a
     particular crime[—]generally retaliation or intimidation'; and

28   'whether and how a crime was committed to benefit or promote a

gang.' " (*People v. Hill, supra*, 191 Cal.App.4th at p. 1120.) Prior to *Sanchez*, experts could recite out-of-court statements upon which they had relied in forming their opinions, even if the statements were otherwise inadmissible under the hearsay rule. Case law held such evidence was not offered for its truth, but only to identify the foundational basis for the expert's testimony. (E.g., *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210.) Pursuant to this rationale, appellate courts deemed the use of out-of-court statements in an expert's "basis testimony" to be compliant with the hearsay rule and the requirements of *Crawford*. (*People v. Valadez* (2013) 220 Cal.App.4th 16, 30.)

In [*People v. Sanchez*, 63 Cal. 4th 665 (2016)], it was determined a trier of fact must necessarily consider expert basis testimony for its truth in order to evaluate the expert's opinion, which implicates the hearsay rule and the Sixth Amendment. (*Sanchez, supra*, 63 Cal.4th at p. 684.) "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. ... If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id.* at p. 686, fn. omitted.)

Factual assertions are "case-specific" if they relate "to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra*, 63 Cal.4th at p. 676.) Federal constitutional issues arise if case-specific facts are presented in the form of testimonial hearsay. (*Id.* at pp. 680–681, 685.) Information contained in a police report is generally construed as testimonial because police reports "relate hearsay information gathered during an official investigation of a completed crime." (*Id.* at p. 694.)

The admission of testimonial hearsay is reviewed for prejudice under the *Chapman* standard. (See *People v. Garton* (2018) 4 Cal.5th 485, 507; *People v. Perez* (2018) 4 Cal.5th 421, 456; *Sanchez, supra*, 63 Cal.4th at pp. 670–671, 698.) The admission of nontestimonial hearsay is a state law error, which is assessed for prejudice under *Watson*. (*Crawford, supra*, 541 U.S. at p. 68; *People v. Duarte* (2000) 24 Cal.4th 603, 618–619.) Where there is a combination of federal and state law errors, the reviewing court applies the *Chapman* standard. (See *Sanchez, supra*, at p. 698; *People v. Martinez* (2018) 19 Cal.App.5th 853, 861 ["Because the instant case involves a mix of testimonial and nontestimonial hearsay, we will apply the federal standard"].)

(Doc. No. 11-39 at 36-37 (footnote omitted)). The appellate court addressed the codefendant's claim, noting that the state conceded error under the Sixth Amendment such that the issue was whether the admission of the evidence was prejudicial. (*Id.* at 40). After concluding any error was not prejudicial to the codefendant, the appellate court turned to Petitioner's claims. (*Id.* at

41).

The appellate court concluded Petitioner was not prejudiced by any error, explaining its ruling:

### 1. Additional Background

### a. March 10, 2009

On this date, during a traffic stop, Rodriguez allegedly admitted "he was a northerner from west side Delano. The Officer also found a clip board with gang indicia on it." The quoted testimony was ordered stricken and the People were not permitted to introduce corroborative evidence.

### b. August 26, 2011

Rodriguez was not directly involved in this incident. According to the police report, a group of Norteño gang members were found in possession of a document containing a list of names, including Rodriguez's "name and moniker." Testimony in this regard was ordered stricken and the People were not permitted to introduce corroborative evidence.

### c. September 18, 2011

On this date, Rodriguez was arrested for being a felon in possession of a firearm. Evidence of the corresponding conviction was admitted to prove one of the predicate offenses. Rodriguez's assertion of error is exclusively based on the People's failure to substantiate an allegation "that [he] was a registered northerner."

### d. August 28, 2014

Rodriguez was arrested on this date while wearing a San Francisco 49ers hat. The arresting officer testified to the incident, and the People's gang expert testified Norteños identify with 49ers imagery. The gang expert initially testified to Rodriguez admitting his affiliation with the "North" when booked into jail, but that testimony was ordered stricken.

### 2. Analysis

Rodriguez joins in Medrano's *Sanchez* claim, but his prejudice analysis boils down to this statement: "[T]he question of his affiliation with the Norteños *at the time of the shooting* was seriously called into question." (Italics added.) Rodriguez notes his self-described "dropout" status and essentially argues the hearsay made jurors less likely to believe he had, in fact, dropped out of the gang prior to the Holguin murder. However, pursuant to his own contentions, Rodriguez kept his dropout status a secret until his interview with Detective Scott on October 23, 2014, which occurred seven days after the shooting.

27

1

2

3

According to the People's gang expert and other witnesses, Norteños are forbidden from dropping out of the gang. Therefore, "dropouts are enemies to active Northern gang members." Dropouts are at risk of being attacked or even killed, which is why they are segregated from active members in custodial settings.

4

5

6

7

8

In the October 2014 interview, Rodriguez claimed to have dropped out of the gang "[w]hen [he] got out of prison last year," meaning some time in 2013. By his own admission, he continued to "associate" with the gang during the relevant time period. In subsequent interviews, he claimed to have dropped out earlier than 2013 but said he always denied his dropout status for safety reasons: "I don't want to be in line to get hit or anything or be, you know what I mean, fuck— fucked up everywhere I go, so I just deny it."

9

10

11

12

13

14

There was admissible evidence of Rodriguez's gang tattoos, including "a large 14 right in the middle of his back and another 14 on his left leg. He also has 'Northern' across the top of his back," plus "the Huelga bird on his wrist," "several five-point stars[,] which are a symbol of somebody with elevated status," and the letter "N" on the side of his neck, among others. He allegedly participated in a gang tattoo removal program in approximately 2013, but the multiple tattoos he still had in October 2014 gave the outward appearance of gang membership. Medrano noted this during a jail call with Diana, commenting on the "big fat 14 on his back" and the "birds everywhere."

15

16

17

18

19

Based on Rodriguez's admission of gang membership through approximately 2013, the risk of prejudice from hearsay concerning his status in 2009 and 2011 was de minimis. The only potential source of prejudice from *Sanchez* error was testimony concerning his August 2014 jail classification admission. However, this evidence was consistent with his statements on the night of his arrest. Rodriguez claimed to be maintaining the appearance of active membership for his own safety, since dropouts are often targeted for violence. This excerpt is illustrative:

20

21

"[RODRIGUEZ]: Listen, I said and nobody knows, because I stay[—]

22

23

"DETECTIVE SCOTT: So you're—so you're a dropout in your own mind. You—nobody knows you dropped out? Because you're still out there.

24

"[RODRIGUEZ]: Exactly. Exactly.

25

26

"DETECTIVE SCOTT: So, to other people you're still active?

"[RODRIGUEZ]: Exactly. [¶] ... [¶]

27

"DETECTIVE SCOTT: But you understand what we're saying though, right? In their—in their minds you're still active, so they[—]

28

"[RODRIGUEZ]: Oh, no, no, no, you're missing the point. You're

28

1    missing the point. I'm telling you to—in their minds I'm a question
     mark ...."

2

3    Julie told the police Rodriguez hated dropouts. In the above-quoted
     interview, Rodriguez said, "Julie doesn't even know [about my
     dropout status]. For all Julie knows is I'm active."

4

5    Because Rodriguez admitted maintaining the outward appearance
     of active gang membership at the time of the murder, which was
6    consistent with his association with gang members such as
     Medrano and Pancho, the *Sanchez* error was clearly harmless
7    beyond a reasonable doubt. (Cf. *People v. Calhoun* (2019) 38
     Cal.App.5th 275, 319 ["Any conceivable *Sanchez* error was
8    harmless because the content of the [hearsay] was independently
     proven" through admissible evidence].)

9    (Doc. No. 11-49 at 41-43).

10        **2. Analysis**

11        In support of ground three, Petitioner argues that the evidence violated his confrontation

12   rights, and the constitutional error was not harmless because the evidence tended to show that he

13   was an active gang member at the time of the shooting, but other evidence indicated he was no

14   longer an active gang member.  (Doc. No. 9 at 29-30).  However, Petitioner does not

15   substantively address the appellate court's conclusion that any error in admitting the evidence

16   regarding his gang membership was harmless beyond a reasonable doubt because his statements

17   in police interviews included admission that he was an active gang member through 2013 and

18   maintained the appearance of active gang membership at the time of the murder.  (*See* Doc. No.

19   11-49 at 42-43).

20        Because the appellate court concluded any error was harmless beyond a reasonable doubt

21   as required by *Chapman*, Petitioner must show that this determination itself was unreasonable to

22   be entitled to habeas relief.  *See Fry v. Pliler*, 551 U.S. 112, 119 (2007).  Petitioner has failed to

23   meet this standard because the appellate court correctly concluded additional evidence supported

24   Petitioner's active gang membership such that the challenged hearsay evidence did not have a

25   substantial and injurious effect on the verdict.  Specifically, in an October 23, 2014 police

26   interview, after being asked if he "still r[a]n with the northerners," Petitioner indicated he

27   "associate[d]" with them and responded affirmatively when the officer said Petitioner was "in

28   good standing."  (Doc. No. 11-5 at 33-34).  Later in the same interview, Petitioner confirmed that

29

1   no one knew he dropped out because he was "still out there" and to other people he was still

2   active. (*Id.* at 91). Thus, there was other evidence to support Petitioner's gang membership such

3   that any error in the gang expert testimony was not prejudicial.

4           Ultimately, Petitioner fails to demonstrate that the state court's rejection of this claim was

5   contrary to, or an unreasonable application of, clearly established federal law, or based upon an

6   unreasonable determination of the facts. Thus, the undersigned recommends that ground three be

7   denied.

8        **D.**     **Ground Four-Reference to "Gun Charge"**

9           In fourth ground, Petitioner argues his right to due process was violated when Diana

10   Torres mentioned that he and Medrano were arrested "on a gun charge." (Doc. No. 1 at 10).

11          **1. State Court Decision**

12       The Fifth Appellate District rejected Petitioner's claim, explaining:

13         **A. Background**

14          As discussed, the victim was killed on October 16, 2014. On

15         October 23, 2014, Medrano and Rodriguez were arrested together outside of Delano Gardens. The arrest occurred during a traffic

16         stop, and "a loaded, short-barreled rifle" was reportedly seized during a search of the vehicle. Because the incident was unrelated

17         to the shooting, Medrano moved in limine to "exclude any and all evidence regarding his and [Rodriguez's] arrest for possession of

18         firearms." The trial court excluded evidence of the gun but ruled admissible the fact of the arrest and other surrounding

19         circumstances.

20         During Diana's trial testimony, the prosecutor asked about statements she made to detectives regarding a conversation with

21         Ojeda. Diana gave a nonresponsive answer: "I recall saying [Medrano] was with [Rodriguez] the day that they got arrested for

22         the gun charge." Medrano's attorney requested a sidebar, after which the trial court said, "Ladies and gentlemen of the jury, with

23         regard to an objection, I am going to sustain that. And I am striking the witness's last response. The last response she gave, I am

24         striking that. The jury will disregard that and treat it as if it had not been spoken. It is not evidence now."

25         The curative instruction was followed by a recess. Outside the presence of jurors, Diana was admonished to "[n]ever refer to that

26         day or that incident again." Next, the trial court asked defense counsel if they believed any further admonitions were required.

27         Both attorneys replied, "No."

28         *////*

## B. Law and Analysis

"Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured." (*People v. Martin* (1983) 150 Cal.App.3d 148, 163.) "Moreover, it is only in the 'exceptional case' that any prejudice from an improperly volunteered statement cannot be cured by appropriate admonition to the jury." (*People v. Franklin, supra*, 248 Cal.App.4th at p. 955; accord, *People v. Seiterle* (1963) 59 Cal.2d 703, 710.) Despite these settled principles, Medrano alleges the stricken testimony caused incurable prejudice and violated his constitutional right to due process and a fair trial. Rodriguez joins in his claim.

We question whether this issue was even preserved for appellate review. (See *People v. Burgener* (2003) 29 Cal.4th 833, 886 [failure to object on federal constitutional grounds at trial results in forfeiture].) If defendants believed they had suffered incurable prejudice, it was incumbent upon them to move for a mistrial. "[A] defendant who receives a curative admonition, but who makes no other objection and seeks no other action, may not complain on appeal." (*People v. Chatman* (2006) 38 Cal.4th 344, 368.) An appellant "may not argue that the court should have granted a mistrial he did not request" (*ibid.*), which is essentially what is happening here. Assuming, arguendo, the claim was not forfeited, we conclude the incident was harmless.

With exception of the alleged "gun charge," the admissibility of the arrest evidence is undisputed. The jury was fully aware Rodriguez and Medrano were arrested together, outside of Delano Gardens, one week after the shooting. Furthermore, as defendants generally concede, the jury knew the murder weapon was never recovered and the arrest was unrelated to the homicide.

Although watered down by exceptions, a general rule of exclusion applies to evidence "that the defendant possessed a weapon that could not have been the one used in the charged crime." (*People v. Sanchez* (2019) 7 Cal.5th 14, 55; accord, *People v. Homick* (2012) 55 Cal.4th 816, 876–877 [stating the historical rule and discussing exceptions].) "[S]uch evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056.) However, any error in this regard is harmless if the jury would have reached the same conclusion based on other properly admitted evidence. (*People v. Riser* (1956) 47 Cal.2d 566, 577–578; cf. *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 414–415 [erroneous admission of hearsay on a collateral issue deemed harmless because "properly admitted" statements by another witness "conveyed the same information"].)

…

The admissible evidence tending to show Rodriguez's propensity to

31

carry guns was extensive. Diana's police interview and trial testimony provided an eyewitness account of Pancho's delivery of a firearm to Rodriguez at the Belmont house one week prior to the shooting. Diana also claimed to have seen Rodriguez "with plenty of guns before," including a "9" and "a little shotgun." She testified to his possession of a gun during a different traffic stop, i.e., one unrelated to the claim on appeal: "I have seen Aaron with a gun .... I was giving him a ride one time, and we got pulled over and they had a gun."

Another witness, Jay, told police Rodriguez was holding a pistol during their conversation about bullets, which occurred within 48 hours of the shooting. Rodriguez admitted asking Jay for bullets but told a dodgy story about wanting the ammunition for a gun possessed by his estranged father. For purposes of this claim, the believability of his excuse is less important than his admitted involvement with firearms.

The victim's daughter, Brianna, had a hostile encounter with Rodriguez outside of Delano Gardens approximately two days after the shooting. She testified: "He got off of his car and he opened the trunk and he—well, to me it looked like a shotgun and he pointed it at me ...." On cross-examination, she clarified Rodriguez did not actually point the object at her.

Janette said Rodriguez told her he had a gun. She never saw it, but she did "remember seeing bullets." Given Janette's statements and those of the other witnesses, Diana's reference to "the gun charge" was eclipsed by more direct and probative evidence of Rodriguez being "the sort of person who carries [guns]." (*People v. Riser, supra*, 47 Cal.2d at p. 577.) Based on the properly admitted evidence alone, "the jury would have concluded that [he] possessed firearms." (*Ibid.*) Therefore, the incident was harmless.

(Doc. No. 11-49 at 27-29).

**2.  Analysis**

Petitioner argues his possession of a gun "a week after the shooting, although irrelevant to any disputed issue of fact at trial, nonetheless had the potential for unduly prejudicing the jury against him" and "this error may have made the difference in the outcome of the jury's verdict." (Doc. No. 1 at 10).  However, Petitioner does not engage with the state appellate court's decision or explain why that court's conclusion that the error was harmless because there was additional evidence that Petitioner possessed firearms was contrary to, or an unreasonable application of, Supreme Court precedent or based on an unreasonable determination of the facts.

As indicated by the appellate court, the trial court struck the statement regarding "the gun

1    charge" and instructed the jury to disregard it.  "A jury is presumed to follow its instructions."

2    *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Petitioner wholly fails to acknowledge that the

3    trial court struck the challenged testimony and ordered the jury not to consider it.  Further, while

4    Petitioner argues he was prejudiced by this single reference to "the gun charge," he fails to

5    acknowledge that the appellate court concluded any error was harmless because there was

6    additional evidence concerning Petitioner's possession of guns close to the time of the crime.

7    (Doc. No. 11-49 at 29).  There was significant evidence beyond the challenged statement

8    regarding Petitioner's possession of guns.  (*See* Doc. No. 11-22 at 57-58 (Diana had seen

9    Petitioner with a gun before the killing); *id.* at 165 (Janette had seen Petitioner with a gun before

10   the killing); Doc. No. 11-25 at 122 (Petitioner pointed a shotgun as victim's daughter two days

11   after the shooting); Doc. No. 11-3 at 206-07 (Petitioner showed Jay a semiautomatic gun two

12   days before the shooting and asked him to get him bullets); Doc. No. 11-4 at 74, 80 (Diana saw

13   Petitioner with "plenty of guns"); *id.* at 169 (Petitioner told Janette he had a gun and she

14   remembered seeing bullets).

15        Petitioner has failed to show that the state appellate court's rejection of his claim

16   concerning the "gun charge" was contrary to, or an unreasonable application of, clearly

17   established federal law, or based upon an unreasonable determination of the facts.  Thus, the

18   undersigned recommends that ground four be denied.

19        **E.    Ground Five-Prosecutorial Misconduct**

20        In ground five, Petitioner argues his right to due process was violated when the prosecutor

21   distorted the reasonable doubt standard in closing arguments.  (Doc. No. 1 at 12).

22        **1.  State Court Decision**

23        The Fifth Appellate District explained its rejection of Petitioner's prosecutorial

24   misconduct claim as follows:

25        **A.  Background**

26        The challenged statement is italicized below:

27        "[PROSECUTOR]: [I]f you have any doubts, listen to all the audio
         or certain interviews, whatever you have a question about. Go to
28       that interview, listen to it, work together on it.

"It was my duty to prove this case beyond a reasonable doubt. That is the highest burden of proof. But it's not an impossible burden. It's the same user-friendly standard that's used in every criminal court across this country, in every state. And you have a jury instruction for beyond a reasonable doubt, and the Judge read it to you earlier. You will have that instruction to refer to.

"*I am just asking you that if you believe the defendants are guilty but you are not sure if I have proven this case beyond a reasonable doubt, I want you to ask yourselves why you believe the defendants are guilty if I didn't prove the case beyond a reasonable doubt.* I thank you for your time.

"[DEFENSE COUNSEL]: Your Honor, I am going to object to that last—

"THE COURT: Well, let's clarify they ultimately must find them guilty beyond a reasonable doubt.

"[PROSECUTOR]: You must find them guilty beyond a reasonable doubt. And I am asking that you find them both guilty beyond a reasonable doubt as to all charges. Thank you.

"THE COURT: And I didn't mean to suggest that you must find them guilty. In other words, only if they are proved beyond a reasonable doubt are they guilty. If it is not proved beyond a reasonable doubt, they are not guilty. That's the correct answer." (Italics added.)

**B.  Law and Analysis**

"It is improper for the prosecutor to misstate the law, and in particular to attempt to reduce the People's burden of proof beyond a reasonable doubt." (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

Furthermore, "arguments of counsel 'generally carry less weight with a jury than do instructions from the court.' " (*People v. Mendoza* (2007) 42 Cal.4th 686, 703.) "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Osband* (1996) 13 Cal.4th 622, 717.) Here, the jury was correctly instructed

1

2

3

4

> on the reasonable doubt standard and presumption of innocence, and it was cautioned, "If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." There is no reason to believe the jury was misled by the prosecutor's statement or disregarded the pattern instructions on reasonable doubt.

5

(Doc. No. 11-49 at 43-45).

6

### 2. Analysis

7

Petitioner argues the prosecution's statement distorted the reasonable doubt standard and

8

made it seem as if a mere belief in a defendant's guilt was the same as proof beyond a reasonable

9

doubt and such was not harmless error given that this was a close case. (Doc. No. 1 at 12).

10

However, Petitioner once again fails to specifically engage with the appellate court's rejection of

11

his claim to show that the rejection was contrary to, or an unreasonable application of, Supreme

12

Court precedent or based on an unreasonable determination of the facts.

13

"To decide if improper comments give rise to a constitutional violation, the relevant

14

question is whether the prosecutors' comments so infected the trial with unfairness as to make the

15

resulting conviction a denial of due process." *Michaels v. Davis*, 51 F.4th 904, 951 (9th Cir.

16

2022) (quotation marks omitted) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

17

Importantly, "a slight misstatement of law by a prosecutor can be rendered harmless by the

18

court's proper instruction to the jury. And under Supreme Court precedent, a jury is presumed to

19

follow the trial court's instructions." *Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir. 2016) (citation

20

modified). However, "improper prosecutorial statements cannot be neutralized by instructions

21

that do not in any way address the specific statements of the prosecutor." *Id.* (citation modified).

22

Here, the appellate court rejected Petitioner's claim because the trial court properly

23

instructed the jury on the reasonable doubt standard. (Doc. No. 11-49 at 45; *see* Doc. 11-30 at

24

150-51). Additionally, after the prosecutor made the challenged statements, the trial court

25

clarified that the jury "must find them guilty beyond a reasonable doubt." (Doc. No. 11-33 at 80).

26

The trial court further clarified, "only if they are proved beyond a reasonable doubt are they

27

guilty. If it is not proved beyond a reasonable doubt they are not guilty." (*Id.* at 81). Thus, even

28

1   assuming the prosecutor's statements were improper, the trial court took appropriate action by

2   addressing the specific comments and clarifying the appropriate standard of proof, thereby

3   neutralizing any improper statement by the prosecution.

4          Accordingly, Petitioner cannot show that the state court's rejection of his prosecutorial

5   misconduct claim was contrary to, or an unreasonable application of, clearly established federal

6   law, or based upon an unreasonable determination of the facts.  Thus, the undersigned

7   recommends that ground five be denied.

8          **F.    Ground Six-Cumulative Error**

9          In his sixth and final ground, Petitioner argues "[c]umulative error requires reversal of

10  [his] convictions."  (Doc. No. 1 at 13).

11         **1.  State Court Decision**

12         The Fifth Appellate District rejected Petitioner's cumulative error claim, ruling:

14                 Under the cumulative error doctrine, "a series of trial errors, though
                independently harmless, may in some circumstances rise by
15              accretion to the level of reversible and prejudicial error." (*People v.
                Hill* (1998) 17 Cal.4th 800, 844; accord, *In re Avena* (1996) 12
16              Cal.4th 694, 772, fn. 32 (dis. opn. of Mosk, J.).) The "litmus test is
                whether defendant received due process and a fair trial.
17              Accordingly, we review each allegation and assess the cumulative
                effect of any errors to see if it is reasonably probable the jury would
18              have reached a result more favorable to defendant in their absence."
                (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349, overruled
19              on other grounds in *People v. Whitmer* (2014) 59 Cal.4th 733, 739–
                742.) Rodriguez argues the *Chapman* standard should apply, but we
20              conclude defendants' respective claims fail even under *Chapman*.

21                        …

22                 Rodriguez has identified a set of plainly harmless errors under
                *Sanchez*. His prejudice argument with regard to the predicate
23              offenses evidence is equally unavailing. Rodriguez has failed to
                show error with regard to the denial of his mistrial motion in
24              connection with Medrano's *Aranda/Bruton* claim. He has failed to
                establish error with regard to the admission of Medrano's statement
25              against penal interest, and his joinder in Medrano's prosecutorial
                misconduct claim also fails on the merits. Likewise, we found no
26              infringement upon his right to a fair trial with regard to Diana's
                "gun charge" testimony. Having assessed the cumulative effect of
27              the actual and potential errors involving Rodriguez, we find no
                basis for reversal.

28  (Doc. No. 11-49 at 45-46).

                                        36

### 2. Analysis

Petitioner argues the errors he alleged in his Petition "mutually reinforced each other" and denied him a fair trial.  (Doc. No. 1 at 13).  However, Petitioner once again fails to present any argument engaging with the state court's analysis to establish why the rejection of his claim was contrary to, or an unreasonable application of, Supreme Court precedent or based on an unreasonable determination of the facts.

"Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant." *Cook v. Kernan*, 801 F. App'x 474, 477 (9th Cir. 2020) (internal quotations and citations omitted).  The cumulative error, however, "must render the trial and sentencing fundamentally unfair." *Id.* (citations omitted).  Absent a finding of any error on any of the proceeding grounds, the Court cannot find cumulative error. *Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018) (a court "cannot consider the cumulative effect of *non*-errors"); *see also McGill v. Shinn*, 16 F.4th 666, 684 (9th Cir. 2021).

Because the undersigned finds none of Petitioner's preceding claims have merit, the undersigned concludes Petitioner cannot show his conviction was fundamentally unfair nor a "unique symmetry" of harmless errors that "amplify each other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).  Thus, ground six is without merit and should be denied.

## V.  CERTIFICATE OF APPEALABIILTY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of

1   his constitutional claims or that jurists could conclude the issues presented are adequate to

2   deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v.*

3   *McDaniel*, 529 U.S. 473, 484 (2000).  Because Petitioner has not made a substantial showing of

4   the denial of a constitutional right, the undersigned recommends that the court decline to issue a

5   certificate of appealability.

6          Accordingly, it is **RECOMMENDED**:

7          1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

8              1); and

9          2.  Petitioner be denied a certificate of appealability.

10                              **NOTICE TO PARTIES**

11         These Findings and Recommendations will be submitted to the United States District

12  Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

13  after being served with a copy of these Findings and Recommendations, a party may file written

14  objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

15  "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

16  **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

17  wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

18  CM/ECF document and page number, when possible, or otherwise reference the exhibit with

19  specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

20  the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

21  636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

22  waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

23

24  Dated:    July 8, 2025

25                              HELENA M. BARCH-KUCHTA
                               UNITED STATES MAGISTRATE JUDGE

26

27

28